# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>S.M.F.,<br><br>                           Appellant. | No. 60709-3-II<br><br>UNPUBLISHED OPINION |

CRUSER, J.—SF was committed to involuntary hospitalization for 180 days based on a finding of grave disability under both statutory definitions of the term (prong (a) and prong (b)), RCW 71.05.020(25).[1] He argues that the trial court erred by finding him gravely disabled under both prongs and that it erred by relying in part on a declaration attached to the petition. The State concedes that it was error for the trial court to consider the declaration, and that absent such consideration, there was only clear, cogent, and convincing evidence that SF was gravely disabled under prong (b) of the statutory definition.

We accept the State's concession that the trial court erred in determining that SF was gravely disabled under prong (a). We conclude that substantial evidence supports the finding that SF was gravely disabled under prong (b). Accordingly, we reverse the trial court's finding of grave disability under prong (a) and affirm its finding of grave disability under prong (b).

---

[1] RCW 71.05.020 was updated in 2025. We cite to the current version of the statute because these amendments do not impact our analysis. See LAWS OF 2025, ch. 226, § 1.

No. 60709-3-II

FACTS

I. BACKGROUND

In October 2024, the State charged SF with felony harassment. The charges were dropped because SF was deemed incompetent due to mental illness. In December 2024, the superior court found that SF was "gravely disabled" as defined in the "Involuntary Treatment Act," ch. 71.05 RCW; SF was committed for 90 days of treatment.

The State later petitioned the trial court for a 180-day extension of SF's commitment and asserted that SF's bipolar I disorder rendered him gravely disabled under both statutory definitions of the term. SF's psychiatrist, Dr. Olga Panarina, and one of SF's nurses authored a signed declaration that was attached to the petition. However, only Dr. Panarina and SF testified at the hearing.

II. TESTIMONY

Dr. Panarina was the first witness to testify. She had met with SF three times but was also familiar with SF's behavior and functioning through clinical team meetings, his previous medical records, daily logs from SF's care providers, and consultation with both "his medical provider and his psychiatric prescriber." 2 Verbatim Rep. of Proc. (VRP) at 25. Dr. Panarina testified that SF has bipolar I disorder, which presents through "disorganized thought process, extreme mood instability, poor insight into his current condition, . . . poor judgment[,] . . . chronic irritability, agitation, destructibility, [difficulty concentrating], and an increase in [ ] rapid speech." *Id.* at 26. SF had told Dr. Panarina that his diagnosis was bipolar II and his only symptom was "being moody"; this statement led Dr. Panarina to believe that SF did not have appropriate insight into his condition. *Id.*

2

Dr. Panarina claimed that SF was unable to exercise proper judgment, specifically to care for his health and safety needs, based on "unmanaged symptoms that continue[d] to impact his ability to objectively identify his needs and to further develop a meaningful discharge planning [sic] towards his release." *Id.* at 27. She had no concerns about SF's ability to maintain his personal hygiene, but she stated he was unable to formulate a plan with staff for how he could take care of himself upon discharge and denied that he needed medication or mental healthcare. Further, she noted SF was unable to eat around others at mealtimes because he would "throw food and drinks and make inappropriate statements, such as hate speech [and] racial slurs." *Id.* at 28.

Dr. Panarina opined that SF's behavioral health condition impacted his perceptions of reality and his thought processes "[i]n terms of his inability to participate in any meaningful discharge planning" and refusing treatment. *Id.* at 29. SF's bipolar I diagnosis also affected his cognitive control during interpersonal communication. Dr. Panarina believed that SF's health and safety needs would not be met as a result of his behavioral health disorder because of his "intermittent mania symptoms," specifically "chronic irritability[,] perseverative thinking, as well as the tangential thought process." *Id.* at 30-31. He would be at risk of serious harm because he could not regulate his own behavior without interventions from staff.

SF believed, at the time of testimony, that he needed "a very specific medication" but not the medication he was currently taking. *Id.* at 31. SF was prescribed both an oral medication and an injection. He would not take more than two doses of the oral medication, but allowed staff to administer a monthly injection. SF participated in group treatment "intermittently." *Id.* at 32.

SF had been admitted for inpatient hospitalization over 30 times since 1980. According to Dr. Panarina, records showed that SF could function independently in the community for a time,

then he would decompensate from that level of functioning. Dr. Panarina did not believe that SF would follow through with mental health care if he were released at the time of the hearing because he refused treatment and medication while hospitalized. Dr. Panarina believed that it was in SF's best interest to stay at the facility to receive medication and group support. She stated that SF needed to make a "reality based" discharge plan to prevent physical harm. *Id.* at 34.

The trial court then examined Dr. Panarina. In response to the court's questions, Dr. Panarina stated that due to an "escalating loss" of cognitive and volitional control over his actions, SF had suffered a "severe deterioration in his routine functioning." *Id.* at 34-35. She also stated that the inpatient care he received was essential for his health and safety, and that he would not receive that care if released into the community. Dr. Panarina concluded that SF was not able to make "rational decisions" based on the deterioration of his mental functioning. *Id.* at 35-36.

During cross-examination, Dr. Panarina testified that the last time she personally evaluated him was on March 15, but that she had consulted with staff and reviewed his records since then. To Dr. Panarina's knowledge, SF was eating sufficient food and getting enough sleep. She believed SF would be able to understand the need to "take care of his activities of daily living" if he were released. *Id.* at 38.

Regarding SF's medications, Dr. Panarina stated that the monthly injection that SF has been taking is an antipsychotic, and that it is strongly recommended to take the oral medication as a mood stabilizer alongside that injection. Dr. Panarina again stated that SF lacked insight into his condition because he would not take his medications. Dr. Panarina was unaware of any "family contacts[, ] community support[,]" or medical providers that SF would contact in the area. *Id.* at 41. She stated that SF had indicated that he would like to participate in discharge planning but was

4

unable to participate in the planning process because he fixated on past issues—the conversation never got to the point where they could discuss SF's medical treatment post-discharge.

SF also testified. He stated that he was not gravely disabled and was not a threat to himself or others. SF stated that he showers and grooms himself, and that if he were released, he would go to a shelter in Lewis County and get food by walking to a grocery store. He stated that he could get money from a payee who "ripped [him] off." *Id.* at 47-48. SF testified that he had "a little money in the bank," that his friend would help him "a little bit," and that he could get money at "the insurance office"; he did not explain how he would earn money. *Id.* at 50. SF stated that he would go to Dr. Schlegel in Lewis County for healthcare and that the injectable that he had received while hospitalized was "a form of [ ] assault." *Id.* at 50-51. When asked how he would take care of himself while released, SF answered the question but also went on a tangent that was irrelevant to the question asked.

When asked if there was anything else the court should know, SF stated that he had "enough money to go quite a while in a homeless shelter, buying my own food, where I'm on the outside and I'm in the community." *Id.* at 52.

### III. MOTION TO EXCLUDE AND PROCEDURAL HISTORY

Before his testimony, SF moved to exclude the declaration that had been filed in support of the petition and for the court to render its ruling based solely on the testimony of Dr. Panarina and SF. In response, the State moved for the court to consider the pleadings. SF asserted that the State would have to reopen its case at this point, because it had already rested its case. The State did not move to reopen its case.

The court stated that Dr. Panarina's testimony was "consistent with the 22-page declaration" attached to the State's petition and that there was sufficient foundation laid to qualify her as an expert witness; therefore, the court would treat "Dr. Panarina's declaration as a report for the purposes of ER 702 and the purposes of this proceeding." *Id.* at 46. The court denied SF's motion to exclude the declaration in support of the petition, and the court took it into consideration for the purpose of the hearing.

The trial court found that the State had proved by clear, cogent, and convincing evidence that SF was gravely disabled under both statutory definitions of the term. The court stated that it would base its decision in part on issues that the State did not raise during the hearing. The court noted that SF had been detained over 30 times since 1980 and that SF was not in a position to "follow his own medication regimens," especially considering that SF viewed injections as a form of assault. *Id.* at 57.

In its ruling, the trial court also mentioned that "[t]here was no testimony at all regarding Mr. S.F.'s prostate condition for which he is required to have medication" and that not taking medication placed SF at "significant risk of serious physical harm." *Id.* at 58. Dr. Panarina did not mention the clinical team's concern regarding SF's prostate during testimony, but her declaration stated that SF's medical provider wanted SF to be evaluated by a urologist to rule out prostate cancer, and that SF was not cooperative. The declaration did not indicate that SF required prostate medication.

The trial court also mentioned that SF did not explain how he would make money once out in the community, that he only indicated that he "had sufficient money on hand to be able to live in a shelter," and that this testimony indicated a lack of a plan. *Id.* at 58.

6

Finally, the trial court noted that SF's behavioral issues were of a "cyclical nature." *Id.* The court again mentioned information from the declaration (a behavioral evaluation from 2022) as support for its assertion that SF had, at one point, been able to function in the community but decompensated because of "[p]oor medication management." *Id.* at 58-59.

The trial court then granted the State's petition for a 180-day involuntary inpatient treatment. In its written order, the trial court referenced its oral ruling as "[f]acts in support" of a finding of grave disability. Clerk's Papers at 43.

SF appeals.

ANALYSIS

SF argues that substantial evidence did not support the judge's finding that SF was gravely disabled under either prong of RCW 71.05.020(25). The State concedes that the trial court could not rely on the declaration because the document was hearsay, and that without consideration of the declaration, the evidence was insufficient to support a finding of grave disability under prong (a). We accept the State's concession that the order should be reversed insofar as it relates to prong (a). For the reasons explained below, we affirm the trial court's finding of grave disability under prong (b).

*A. Legal Principles*

If a trial court or jury finds that a person is gravely disabled and "that the best interests of the person or others will not be served by a less restrictive treatment," the court may order that that person be involuntarily committed to the custody of the department of social and health services for up to 180 days. RCW 71.05.280(4); .320(1)(a), .320(8). Grave disability is defined as

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her

essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25).

Under prong (b) of this definition the petitioner must provide evidence that

reveal[s] a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

*In re Det. of LaBelle*, 107 Wn.2d 196, 208, 728 P.2d 138 (1986). RCW 71.05.020(25)(b) requires that the petitioner establish "that the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *Id.* (interpreting former RCW 71.05.020(1)(b) (1979) (emphasis omitted)). In other words, the individual's failure to receive care must be the result of the individual's inability to make a rational decision regarding his need for treatment.

A trial court *must* consider a person's historical behavior when determining if the person is gravely disabled. RCW 71.05.245(1). "Symptoms or behavior which standing alone would not justify civil commitment may support a finding of grave disability" when the symptoms "are closely associated with symptoms or behavior which preceded and led to a past incident of involuntary hospitalization, severe deterioration, or one or more violent acts;" and when "without treatment, the continued deterioration of the respondent is probable." RCW 71.05.245(2).

At trial, the State must prove that the person is gravely disabled "by clear, cogent[,] and convincing evidence." *LaBelle*, 107 Wn.2d at 209; RCW 71.05.310. We consider whether

8

substantial evidence supports the findings of fact and whether the findings of fact support the conclusions of law. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). "[W]here the State must prove its case by clear, cogent[,] and convincing evidence, the evidence [supporting the trial court's findings] must be more substantial than in the ordinary civil case in which proof need only be by a preponderance of the evidence." *LaBelle*, 107 Wn.2d at 209. Instead, "the ultimate fact in issue must be shown by evidence to be 'highly probable.' " *Id*. (quoting *In re Interest of Pawling v. Goodwin*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)). We "view the evidence in the light most favorable to the petitioner." *A.F.*, 20 Wn. App. 2d at 125. We do not review the trier of fact's assessment of witness credibility or the persuasiveness of the evidence. *Id*.

*B. Application*

SF contends that there was not clear, cogent, and convincing evidence that he was disabled under prong (b) because Dr. Panarina did not specify in detail how SF's health and safety would be impacted upon release. We disagree.

Dr. Panarina's testimony indicated that SF experienced severe deterioration of routine functioning. She stated that SF could not regulate his own behavior, evidenced by his throwing food and drinks at other residents and using hate speech towards them. Dr. Panarina opined that such an inability to control his behavior would likely result in physical harm without medication management. The fact that SF had been admitted to inpatient hospitalization over 30 times since 1980 evidences this decompensation.

The hearing testimony also indicated that SF would not take the necessary medication upon release. Dr. Panarina concluded that SF did not have proper insight into his condition because he

thought that his only symptom was "being moody." VRP at 26. Additionally, SF consistently refused his oral medication while hospitalized and testified that receiving his other medication, an injectable, was a form of assault. According to Dr. Panarina, the oral medication should be taken along with the injectable medication to receive the full benefits.

In total, the State produced clear, cogent, and convincing evidence that upon release, SF would fail to take the necessary medication, and that such a scenario would lead to decompensation and a risk of physical harm. Such a scenario meets prong (b) of the definition of grave disability.[2]

CONCLUSION

We accept the State's concession that the trial court should not have relied on the information in the declaration to determine whether SF was gravely disabled and that, absent a reliance on such information, there was not substantial evidence that SF was disabled under prong (a). There was, however, substantial evidence that SF was gravely disabled under prong (b). We reverse the trial court's finding under prong (a) and affirm its finding under prong (b).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

---

[2] SF argues that the 2022 evaluation, during which SF's symptoms were managed, could not form a factual basis for a determination of grave disability under prong (b) because Dr. Panarina did not mention it in her testimony. Even without considering the evaluation, the State produced evidence sufficient to support a finding of grave disability under prong (b).

No. 60709-3-II

CRUSER, J.

We concur:

PRICE, A.C.J.

MAXA, J.

11